IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Gary Legrande Wise, ) | |
| ) | Civil Action No.  6:13-2712-RMG-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff, who is proceeding *pro se*, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for widower's insurance benefits ("WIB")[2] and supplemental security income ("SSI") benefits on July 19, 2010, alleging that he became unable to work on August 20, 2002.  The applications were denied initially and on

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]To qualify for WIB, an individual must show that he is the widower of a deceased wage earner, has attained the age of 50, is unmarried (with certain exceptions) and is under disability that began no later than seven years after the wage earner's death or seven years after he was entitled to survivor's benefits. *See* 20 C.F.R. § 404.335.

reconsideration by the Social Security Administration. On July 27, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and Carroll H. Crawford, an impartial vocational expert, appeared on January 28, 2013, considered the case *de novo*, and on March 6, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 20, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) It was previously found that the claimant is the unmarried widower of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widowers benefits set forth in section 202(f) of the Social Security Act.
>
> (2) The prescribed period ended on April 30, 2009.
>
> (3) The claimant has not engaged in substantial gainful activity since August 20, 2002, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et. seq.*).
>
> (4) The claimant has the following severe impairments: status post remote coronary artery bypass grafting, coronary artery disease with right lower extremity claudification, and lumbar spine degenerative stenosis (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (5) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

(6) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except for work requiring lifting or carrying more than 20 pounds; lifting or carrying of 11 to 20 pounds more than occasionally; lifting or carrying of 9 pounds or less more than frequently; standing and/or walking in combination for more than a total of 6 hours in an 8 hour workday; climbing ladders or scaffolds; excessive sun exposure; exposure to humidity or temperature extremes; or more than occasional stooping, twisting, crouching, kneeling, crawling, or climbing stairs or ramps.

(7) The claimant has no past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(8) The claimant was born on August 25, 1958, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

(9) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(10) Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. §§ 404.1568 and 416.968)

(11) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the

> claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

> (12) The claimant has not been under a disability, as defined in the Social Security Act, from August 20, 2002, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

5

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

*Medical evidence*

The record indicates that the plaintiff received his medical care at the South Carolina Department of Corrections ("SCDC") and the Veteran's Administration Medical Center in Columbia, South Carolina ("VAMC). The plaintiff was incarcerated from 2002, shortly after the death of his wife, to 2010 (Tr. 42, 53). In August 2002, the plaintiff suffered a massive heart attack while he was incarcerated (Tr. 53, 327).

Medical records from SCDC show the plaintiff had some lower extremity problems beginning in 2009. In August 2009, the plaintiff had lower leg scars from varicose vein removal. In October 2009, the vascular clinic recommended a repeat aortogram because it had been a year since the last test and the plaintiff's symptoms had changed (Tr. 292-304). The test, performed on December 9, 2009, showed no change since 2008, and revealed mild right external iliac artery disease, moderate to severe right superficial femoral artery disease, and tibiperoneal disease with occlusion of the anterior tibial artery and disease in the proximal posterior tibial artery (Tr. 302-303, 317).

In January 2010, the plaintiff was diagnosed with peripheral vascular disease with severe claudication (pain, usually in the legs, caused by restricted blood flow). He was recommended for surgery in March 2010 (Tr. 19, 310, 314). On August 17, 2010, the plaintiff saw family practice physician Sujeeth K. Shetty, M.D., who noted that the plaintiff was diagnosed with a methicillin-resistant staphylococcus aureus ("MRSA") infection while in prison. The record does not reflect any limitations related to this diagnosis (Tr. 329). In

August and September 2010, he had no gross or sensory or motor deficits (Tr. 19, 328, 331).

On October 6, 2010, the plaintiff was seen at the VAMC. It was noted that he walked well with a steady gait (Tr. 19, 409). On October 12, 2010, the plaintiff returned to the VAMC for evaluation of lupus. The physician noted that the plaintiff had lesions related to discoid lupus, but had been asymptomatic since 2005. On October 26, 2010, the plaintiff visited the VAMC complaining of chest and leg pain. The chest pain was related to his surgical incision. The plaintiff reported that he had pain and numbness in both calves when he walked. During this visit, it was noted that he was on plaquenil for discoid lupus but there were no active lesions. A screen for post-traumatic stress disorder ("PTSD") was negative on this visit (Tr. 20, 375-79, 383, 391, 393).

On February 4, 2011, during a visit to the VAMC, the plaintiff's clinical musculoskeletal and neurological examination was unremarkable (Tr. 485-86). On February 7, 2011, during an appointment with Lesa M. Depeal, LMSW, a social worker, the plaintiff was noted to have some symptoms of PTSD, but he did not meet all of the criteria. He consistently had unremarkable mental status examinations (Tr. 21, 479, 489, 513, 509, 514, 523, 532, 641). On February 15, 2011, VAMC notes indicate cardiac catherization showed some abnormalities, but he was able to be managed medically (Tr. 19, 472-75, 594).

The plaintiff's record was reviewed by State agency physicians in January, May, and June 2011. Those physicians specifically noted the plaintiff's cardiac issues, including peripheral vascular disease and claudification, and concluded that the plaintiff could perform a range of light work (Tr. 23-24, 446-53, 569-78).

On September 9, 2011, the plaintiff went to the emergency department at Toumey Medical Center in Sumter, South Carolina after he was involved in an automobile accident. The plaintiff complained of lower back pain. He was ambulatory to triage.

7

Clinical neck and back examinations revealed some tenderness. Upper and lower extremity and neurological examinations were unremarkable. He was diagnosed with cervical and lumbar strains and discharged. Discharge notes indicate that the plaintiff walked without assistance and that he was driving (Tr. 1086-89).

In September 2011, the plaintiff underwent femoropopliteal bypass surgery, and in March 2012, he underwent right common femoral artery reconstruction. Both surgeries were to alleviate pain caused by peripheral vascular disease. After the March 2012 surgery, at discharge, he was ambulating around the surgical unit without difficulty (Tr. 703-705, 583-665, 866-83, 884-933, 1034-82).

VAMC notes regarding radiograph scans in October 2011 and an MRI in December 2011 show degenerative disc disease at the L5-S1 level and degenerative stenosis involving L5-S1 intervertebral nerve root canals bilaterally (Tr. 582, 753, 1095).

On November 15, 2011, the plaintiff lacerated his left hand with a saw. Radiographs of the hand were unremarkable, except for some soft tissue swelling along the radial and palmar aspects of the index finger at the level of the middle phalanx (Tr. 752).

On January 19, 2012, the plaintiff visited the VAMC for a complete history and physical examination. He stated that he did not have back pain prior to his vehicle accident. The clinical exam showed good range of motion, cervical tenderness, and positive straight leg raises. Radiographs of the cervical spine were unremarkable, except for mild hypertrophic changes of the anterior vertebrae (Tr. 625, 628, 750).

In a VAMC progress report dated March 7, 2012, it was noted that the plaintiff had no difficulty getting to places beyond walking distance, doing housework, and grocery shopping (Tr. 904). On March 21, 2012, the plaintiff was seen by T. J. Bunt, M.D., at the VAMC for follow up of femoral artery reconstruction surgery in his right leg. Dr. Bunt noted that the plaintiff was overly dramatic, but that his attitude changed once he was told that his medication would be refilled. He complained that his right calf still hurt with short distance

walking and that he had numbness in his right leg when he walked (Tr. 890). At an appointment on April 16, 2012, it was noted that the plaintiff had adequate blood flow to the right leg and he required no further follow-up (Tr. 832-33).

On April 13, 2012, the plaintiff was referred to the pain clinic after complaints of constant low back pain. The plaintiff reported that the pain radiated down his right leg. Clinical examination showed antalgic gait, lumbosacral myofascial tenderness, diminished sensation in the left leg, and positive straight leg raising on the left. Assessment was lumbar degenerative disc disease (Tr. 823, 830).

In May 2012, the plaintiff had good overall strength, normal range of motion, normal balance, an independent gait using a cane, and no pain (Tr. 18, 1027). He could walk on a treadmill for 20 minutes, use a SCI-FIT for 10 minutes, and perform 50 repetitions on an abdominal machine using 110 pounds (Tr. 18, 1027-1028, 1030). He reported he prepared his own food, walked almost daily, and worked in his yard (Tr. 18, 948).

On June 1, 2012, the plaintiff presented at the VAMC pain clinic. Examination showed lumbosacral tender points, lumbar facet tenderness, antalgic gait with a cane, positive straight leg raising on the left, decreased lumbar range of motion, decreased sensation in the left leg, and decrease reflexes in the ankles (Tr. 1022, 1026). On June 4, 2012, the plaintiff was discharged from the kinesiotherapy program after making good progress (Tr. 1019-20). On July 20, 2012, the plaintiff returned to the pain clinic with minimal movement, antalgic gait, and limited functional ability (Tr. 1006). A few days later the plaintiff visited the MOVE clinic where he reported that he was active and walking (Tr. 1003). On August 7, 2012, physical therapy notes indicate that treatment with a TENS unit had been relieving the plaintiff's symptoms. He walked into the clinic with an antalgic gait with decreased weight bearing on his right leg with his trunk forward flexed. He said he used a walker when the pain got really bad (Tr. 996). On August 10, 2012, the plaintiff went to the VAMC for a primary care visit. He complained of neck and low back pain. The

plaintiff noted no difficulty with bladder or bowel functions nor did he complain of leg weakness. The clinical examination showed tenderness at the lumbosacral spine and paraspinal muscles (Tr. 986, 989-90).

*Administrative Hearing Testimony*

The plaintiff was 55 years old when the ALJ denied his application. At the administrative hearing, the plaintiff testified that he has a high school equivalency diploma. At other times he stated that he had a Bachelor of Arts degree in marketing from the University of Maryland (Tr. 16; *see* Tr. 355, 372). He served in the Army from 1976 to 1979 (Tr. 67). The plaintiff claimed he was in a wheelchair for almost his entire period of incarceration from 2002 to 2010 (Tr. 53). He also claimed to have been receiving pain medication for his chest and leg pain since 2002 (Tr. 56-57). At the hearing, the ALJ noted that he did not see evidence of active lupus, but the plaintiff testified to having occasional flares of carbuncles related to lupus (Tr. 64-65). The plaintiff also testified that he had PTSD from an explosion during his service in the Army in Germany (Tr. 68). He claimed he could only sit for 10 to 15 minutes at a time (Tr. 71). The vocational expert testified that the plaintiff had no past relevant work. Although the plaintiff reported work as a self-employed painter, the earnings record did not reflect substantial gainful activity (Tr. 69-70).

## ANALYSIS

The plaintiff argues that the ALJ erred by failing to find that his impairments meet Listings 4.00 (cardiovascular system) and 1.00 (musculoskeletal system) (pl. brief at 3-7).

*Listings*

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). The undersigned finds that substantial evidence supports

10

the ALJ's finding that the plaintiff does not have an impairment or a combination of impairments that meets or equals any section of the Listing of Impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The plaintiff first cites Listing 4.00 (cardiovascular system) and argues that his peripheral vascular disease meets the listing (pl. brief at 3-4). The pertinent section of Listing 4.00 is Listing 4.12, which requires the following:

> Peripheral arterial disease, as determined by appropriate medically acceptable imaging (*see* 4.00A3d, 4.00G2, 4.00G5, and 4.00G6), causing intermittent claudication (*see* 4.00G1) and one of the following:
>
> A. Resting ankle/brachial systolic blood pressure ratio of less than 0.50.
>
> OR
>
> B. Decrease in systolic blood pressure at the ankle on exercise (see 4.00G7a and 4.00C16–4.00C17) of 50 percent or more of pre-exercise level and requiring 10 minutes or more to return to pre-exercise level.
>
> OR
>
> C. Resting toe systolic pressure of less than 30 mm Hg (see 4.00G7c and 4.00G8).
>
> OR
>
> D. Resting toe/brachial systolic blood pressure ratio of less than 0.40 (see 4.00G7c).

*Id.* § 4.12.[3]

As argued by the Commissioner, the plaintiff has failed to show that his impairments met Listing 4.12. In January 2010, the plaintiff was diagnosed with peripheral

---

[3]The Commissioner cites different requirements for this listing, apparently from an older version of the Code of Federal Regulations. However, the requirements discussed above were those in effect at the time of the ALJ's decision as well as currently. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.12 (effective Feb. 26, 2014); *Id.* (effective June 13, 2012, to April 4, 2013).

vascular disease with severe claudication. He was recommended for surgery in March 2010 (Tr. 19, 310, 314). However, in August and September 2010, he had no gross sensory or motor deficits (Tr. 19, 328, 331). In October 2010, he ambulated well with a steady gait (Tr. 19, 409). In February 2011, cardiac catherization showed some abnormalities, but he was to be managed medically (Tr. 19, 471-75, 594). The plaintiff underwent femoropopliteal bypass surgery in September 2011, and in March 2012, he underwent right common femoral artery reconstruction. (Tr. 19, 703-705). By April 2012, he was noted to have adequate blood flow to the right leg, and he required no further follow-up (Tr. 19, 832-33). Further, State agency physicians reviewed the record in January, May, and June 2011, and specifically noted the plaintiff's cardiac issues including peripheral vascular disease and claudication. They all concluded that the plaintiff could perform a range of light work (Tr. 23-24, 446-453, 569-578). Moreover, the plaintiff has highlighted no systolic blood pressure readings supporting his contention that his peripheral vascular disease meets the listing. The ALJ specifically noted that an echocardiogram in September 2010 showed normal systolic function and the ejection fraction was 55 to 60 percent (Tr. 19; *see* Tr. 378).

The plaintiff also cites Listing 1.00 (musculoskeletal system) in his brief, arguing that his "severe degenerative disc disease, in his lower back, and upper neck, along with chronic chest pain" meet the listing (pl. brief at 5-7). In discussing the plaintiff's musculoskeletal impairment, the ALJ noted (Tr. 17-18) that in January 2012, the plaintiff stated that he did not have back pain prior to his vehicle accident (presumably the one in September 2011). The clinical exam showed good range of motion, cervical tenderness, and positive straight leg raises. Radiographs of the cervical spine were unremarkable, except for mild hypertrophic changes of the anterior vertebrae (Tr. 625, 628, 750). In March 2012, it was noted that the plaintiff had no difficulty getting to places beyond walking distance, doing housework, and grocery shopping (Tr. 904). In April 2012, clinical

examination showed antalgic gait, lumbosacral myofascial tenderness, diminished sensation in the left leg, and positive straight leg raising on the left. Assessment was lumbar degenerative disc disease (Tr. 823, 830). In May 2012, the plaintiff had good overall strength, normal range of motion, normal balance, an independent gait using a cane, and no pain (Tr. 18, 1027). He could walk on a treadmill for 20 minutes, use a SCI-FIT for 10 minutes, and perform 50 repetitions on an abdominal machine using 110 pounds (Tr. 18, 1027-1028, 1030). He reported he prepared his own food, walked almost daily, and worked in his yard (Tr. 18, 948). In June 2012, examination showed lumbosacral tender points, lumbar facet tenderness, antalgic gait with a cane, positive straight leg raising on the left, decreased lumbar range of motion, decreased sensation in the left leg, and decrease reflexes in the ankles (Tr. 1022, 1026). On June 4, 2012, the plaintiff was discharged from the kinesiotherapy program after making good progress (Tr. 1019-20). On July 20, 2012, the plaintiff returned to the pain clinic with minimal movement, antalgic gait, and limited functional ability (Tr. 1006). A few days later the plaintiff visited the MOVE clinic where he reported that he was active and walking (Tr. 1003). On August 7, 2012, physical therapy notes indicate that treatment with a TENS unit had been relieving the plaintiff's symptoms. He walked into the clinic with an antalgic gait with decreased weight bearing on his right leg with his trunk forward flexed. He said he used a walker when the pain got really bad (Tr. 996).

Here, the plaintiff has failed to show an inability to ambulate effectively, which is defined as "having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both upper extremities*." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b()(1) (emphasis added). As noted by the Commissioner (def. brief at 7), ineffective ambulation is a "critical factor to be considered under all of the Musculoskeletal System Listings" under § 1.00 because it is included in the relevant criteria in the

13

introduction to the listing. *McKoy v. Astrue*, C.A. No. 4:08-2329-CMC-TER, 2009 WL 2782457, at *16 (D.S.C., Aug. 28, 2009). As the ALJ noted, the plaintiff's allegations about an inability to ambulate were "simply incredible" (Tr. 15). Although the plaintiff claimed to be in a wheelchair for the entire time he was incarcerated (July 2002 to February 2010), there was no record of a wheelchair issued to him in prison (Tr. 53).

The plaintiff indicates that the South Carolina Department of Motor Vehicles issued him a handicapped sticker (pl. brief at 7, ex. A). However, even assuming that such a placard was issued to him during the relevant time period at issue here, "such is not *per se* evidence that a person cannot effectively ambulate as [South Carolina] law allows issuance of such placard to persons who simply need one cane to walk. [S.C. Code Ann. § 56-3-1910(A) (2009)]. Likewise, plaintiff's use of a single cane . . . does not meet the criteria of § 1.00(B)(2)(b)." *Gann v. Astrue*, No. 1:09-cv355, 2010 WL 3811942, at *7 (W.D.N.C. 2010).

Based upon the foregoing, the ALJ did not err in finding the plaintiff's impairments did not meet or medically equal any listing.

### *Residual Functional Capacity*

The plaintiff also appears to argue that the ALJ overlooked his diagnoses of lupus, MRSA, hypertension, and PTSD (pl. brief at 6). With respect to MRSA, the plaintiff received that diagnosis in prison, but the record does not appear to reflect any limitations related to this diagnosis, and the plaintiff has cited to none (*see, e.g.*, Tr. 329). With respect to his lupus, the plaintiff conceded at the administrative hearing that he had only occasional flares of carbuncles and otherwise attributed no other limitations to that impairment (Tr. 64-65). The ALJ specifically considered the plaintiff's lupus, noting that in October 2010, his physician stated that the plaintiff had lesions related to lupus, but otherwise had been asymptomatic since 2005 (Tr. 20; *see* Tr. 379, 391, 393). The ALJ also considered the plaintiff's PTSD, noting that in October 2010 a PTSD screen was

negative (Tr. 20; *see* Tr. 383). In January 2011, the plaintiff was noted to have some PTSD symptoms, but he not meet all the criteria (Tr. 20; *see* Tr. 479). Also, the plaintiff consistently had unremarkable mental status examinations (Tr. 21; *see* Tr. 479, 489, 503, 509, 514, 523, 532, 641). The ALJ also noted that State agency psychologists reviewed the record and concluded that the plaintiff had no severe mental impairments (Tr. 21; *see* Tr. 432-45, 555-68). Based upon the foregoing, the ALJ did not err in his consideration of these impairments.

In making the RFC finding, the ALJ assessed the plaintiff's credibility in accordance with applicable law, finding that while the plaintiff's medically determinable impairments could reasonably cause some of his reported symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible (Tr. 15-17, 22-26). Specifically, the ALJ noted inconsistencies between the plaintiff's testimony and the record, lack of objective findings, control of his symptoms with medications, and the plaintiff's activities of daily living (*id.*). *See Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (while an ALJ may not rely *solely* on objective evidence in discounting a claimant's subjective allegations, an ALJ may consider the lack of objective evidence or other corroborating evidence as factors in the credibility assessment) (citing *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996)); SSR 96-7p, 1996 WL 374186, at *3 (setting out factors to be considered in assessing credibility); 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ also considered the medical opinions of record and gave specific reasons for the weight accorded each opinion as required by Social Security Ruling 96-2p (Tr. 22-24). 1996 WL 374188, at *5.

The plaintiff attached to his brief a questionnaire completed by Dr. James Elnore, which was completed in June 2013, three months after the ALJ's decision (pl. brief, ex. B). In that questionnaire, Dr. Elnore provided several diagnoses and his opinion as to the plaintiff's functional limitations. Dr. Elnore specifically stated that the "earliest date that

the description of symptoms and limitations" applied was as of the date he completed the questionnaire, June 19, 2013 (*id.*, ex. B at 7). The plaintiff submitted the questionnaire to the Appeals Council, which found that the opinion applied to a time after the relevant period, and thus did not affect the ALJ's decision (Tr. 2). *See* 20 C.F.R. § 404.970(b) (explaining that evidence submitted to the Appeals Council must be "new and material" and relate to the relevant time period). The Appeals Council returned the evidence to the plaintiff for use in a new application, and the opinion was not made part of the record (Tr. 2). As the opinion is not included in the certified administrative record, the court therefore cannot consider it. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). *See generally Wilkins v. Secretary of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991) (explaining new and material evidence).

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 24, 2014
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4$_{th}$ Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 300 East Washington Street
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).